**UNITED STATES DISTRICT COURT**
**OF THE MIDDLE DISTRICT OF FLORIDA**

**Case No:**

AMY DONOFRIO,

      Plaintiff

v.

DUVAL COUNTY PUBLIC SCHOOLS
and SCOTT SCHNEIDER, individually,

      Defendants.

_____/

## COMPLAINT

Plaintiff, AMY DONOFRIO ("Ms. Donofrio" or "Plaintiff"), by and through her undersigned counsel, hereby files this complaint against Defendants, DUVAL COUNTY PUBLIC SCHOOLS ("DCPS" or the "District") and SCOTT SCHNEIDER, individually ("Mr. Schneider" or "Defendant Schneider"), and alleges as follows:

## INTRODUCTION

Defendants DCPS and Mr. Schneider have targeted, harassed, humiliated, and effectively ended the meaningful employment of Ms. Donofrio, a 13-year veteran teacher who was removed from her teaching job at Robert E. Lee High School ("School," "High School" or "Lee High School") in Jacksonville, Florida, in retaliation for her protected speech, her complaints about discrimination, and, more broadly, her support of Black students' lives.

In the 2014-15 school year, Ms. Donofrio was assigned to teach leadership classes. The next year, she was asked to teach a follow up Leadership Skills Development course for Black male students, which included a "Telling Your Story" project. Ms. Donofrio was devastated to learn about the pervasiveness of racism and tragedies that plagued her students' lives. After

realizing she had failed to fully comprehend the students' realities and that her capacity to develop solutions was confined to her own limited knowledge and experiences, Ms. Donofrio invited the students to co-design a curriculum to promote their professional development, civic engagement, college preparation, and empowerment. Within one year, with no formal curriculum, training or funding from the District, the students, who had been labeled "at-risk," learned to transform their personal tragedies into positive change through sharing their stories, and by doing so, opened the door to opportunities none of them could have imagined. They presented at the U.S. Department of Justice, testified before Congress, presented at the White House, met President Barack Obama,[1] made the front page of the *New York Times*, won first place in a competition sponsored by Harvard, and traveled there to present. Eventually, what had once been a course for class credit at the High School expanded into what became widely known as the EVAC Movement and gained local and national recognition and accolades along the way. In response to their experiences of being arrested and falsely accused of wearing gang paraphernalia, EVAC students designed a clothing line of hoodies and t-shirts that say, "I am not a gang member." These hoodies and t-shirts have become emblematic of EVAC members and have become popular at schools across the City of Jacksonville. In 2020, the "EVAC Movement Story" was published in the *Harvard Educational Review*.[2]

Not everyone was pleased to see the EVAC students excel and the EVAC Movement take flight. To put this in context, Lee High School is named after Robert E. Lee, commander of the Confederate States Army during the American Civil War, an anti-abolitionist who chastised "the systemic & progressive efforts of certain people in the North, to interfere with & change the

---

[1] https://www.jacksonville.com/news/20180530/evac-movement-young-juvenile-justice-advocates-graduate-from-lee-high
[2] https://www.hepg.org/her-home/issues/harvard-educational-review-volume-90,-issue-2/her-article/the-evac-movement-story

domestic institutions of the South," an avowed white supremacist, and an "owner" of 10 to 15 human beings, who were Black, whom he held in captivity, and to whom he was known to be especially cruel. The High School has indeed lived up to its namesake's principles: in 2017, almost 70% of Lee High School's students were Black, but 100% of the students that the School expelled were Black.[3]

At first, Defendants DCPS and Schneider, then principal of Lee High School, politely tolerated the EVAC Movement. But as EVAC's notoriety grew, Defendants' tolerance quickly waned. Despite their incredible successes, in 2017, Defendants told Ms. Donofrio that her class had to be taught on her planning period or be relegated to a school club or activity "due to budget cuts." Because the school's seeming censorship of an extraordinarily successful class focused on Black students was of great public importance, Ms. Donofrio posted about the class cancellation on Facebook, and it made the news.[4] Defendants' public statements contradicted the private reasons it gave Ms. Donofrio for threatening to cancel the course. Because of public pressure, Defendants allowed EVAC to continue, but depleted the course, removing most of the students who had been a part of EVAC from its start. Later, the School would disavow itself of EVAC, relegated the class to a school activity, and reassigned Ms. Donofrio to teach English literature over her objections. Today, EVAC is neither a class offered for course credit nor a school-sponsored club. In 2019, the EVAC Movement incorporated as a Florida not-for-profit corporation.

Since then, Defendants have made Ms. Donofrio's life, and the lives of students who are affiliated with the EVAC Movement, a nightmare. In October 2020, DCPS told Ms. Donofrio she

---

[3] Office for Civil Rights, Survey Year 2017, https://ocrdata.ed.gov/profile/9/school/266776/summary.
[4] https://www.jacksonville.com/news/education/2017-07-28/award-winning-evac-movement-not-returning-jacksonville-s-lee-high-school

should take down a Black Lives Matter flag hanging outside of her classroom because it "might" violate district policy.[5] When Ms. Donofrio asked which policy it violated, DCPS provided her with two policies that did not apply to her. After she advised the administration that the policies were inapplicable, and that she was supporting a federally protected class with the statement that Black lives matter, they offered no further response, and she left the flag hanging. As months passed, Ms. Donofrio thought the flag was no longer an issue.

In March of 2021, though, the flag became an easy target when Defendants decided they wanted to get rid of her. That spring, Lee High hosted a series of public meetings in response to community demands that the District rename the school. School administrators banned all the Black custodial staff from at least one public meeting, directing them to remain in the cafeteria during the meetings. Ms. Donofrio made a formal complaint to a school board member about the treatment of the Black workers as well as the emotional harm to Black students caused by the caustically racist statements made during the meetings by alumni of the school, which the administrators allowed. After Ms. Donofrio's formal complaints, the School principal, Timothy Feagins, ordered Ms. Donofrio to take down the Black Lives Matter flag posted outside of her classroom. This time, DCPS pointed to another policy, "No employee shall use his/her position in any way to influence or attempt to influence students to support or oppose any candidate, party or issue. Such prohibition shall include, but not be limited to, any form of advocacy or opposition in

---

[5] Ms. Donofrio hung the flag after students complained of hostile and racially insensitive statements made by other teachers during the 2020 election cycle and wanted to indicate to students that her classroom was a safe space for Black students.

a classroom or school setting or other school-related student-teacher relationship."[6] Ms. Donofrio did not take down the flag, which simply and factually declares Black lives matter.[7]

At public meetings regarding the renaming of the High School in March of 2021, Ms. Donofrio recorded, and later posted a compilation of the public comment, which included a white alumnus saying, "slaves are to obey their masters" and another individual saying, "if there are problems at the school, it is because it is predominantly African-American." Her recording went viral[8] and the news picked up the story. On March 23, 2021, school administration took down the Black Lives Matter flag.

Students were outraged by both the racist public comments and the administration's removal of the flag. The students started a petition[9] to bring back Ms. Donofrio to the classroom, which currently has over 15,000 signatures. They also planned to hold a peaceful walk-out during lunch and to put a Black Lives Matter flag over a Robert E. Lee placard at the School. When it came time to walk out, School administrators and school resource officers prevented the students from leaving their classrooms and told the students that they would not graduate if they participated.

Following the name change meetings, as of March 25, 2021, Ms. Donofrio was "administratively reassigned to paid, non-teaching duties" and banned from Lee High School

---

[6] ***See*** **Exhibit "21,"** *and see* https://www.news4jax.com/news/local/2021/03/24/removal-of-lee-high-teachers-blm-flag-sparks-student-response/?fbclid=IwAR287tU0E_ltvT8QuLHOh7bcNriO8TfrZDbHwUczTjvi1F1qOAA_rfvlbeg

[7] To be clear, the mattering of Black lives, including the lives of nearly 70% of the students at Lee High School, is not a debatable issue about which modern and reasonable minds can disagree or take sides.

[8] https://www.news4jax.com/news/local/2021/03/24/removal-of-lee-high-teachers-blm-flag-sparks-student-response/?fbclid=IwAR287tU0E_ltvT8QuLHOh7bcNriO8TfrZDbHwUczTjvi1F1qOAA_rfvlbeg

[9] https://www.change.org/p/duval-county-public-schools-bring-back-ms-donofrio?utm_content=starter_cl_share_content_en-us_7%3Av1&recruiter=1012924585&utm_source=share_petition&utm_medium=copylink&utm_campaign=tap_basic_share&utm_term=01dc9b875d7e4e5597f0bd8edadbcbc5&fbclid=IwAR22qXvGVRwM2dChhCv05U1zRvdJPUjKJPtesVYHXf87bEKWxraKvHaR_Dc

pending an investigation by the District into its vague, false and retaliatory allegations of misconduct.

## VENUE AND JURISDICTION

1.    Plaintiff AMY DONOFRIO ("Ms. Donofrio") brings claims for retaliatory treatment and seeks injunctive relief, damages, and other remedies allowed by law pursuant to: the Florida Civil Rights Act, Florida Statute § 760, *et seq.* ("FCRA"); the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* (1964) Title VII; 42 U.S.C. § 1981, § 1981(a), *et seq.* and § 1983; the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.* (1964) Title VI; Protection of School Speech, Fla. Stat. § 1003.4505; and, U.S. Const. Amend. I., First Amendment.

2.    Ms. Donofrio has exhausted the administrative remedies for the claims herein.[10]

3.    Defendant DCPS has a principal place of business located at 1701 Prudential Drive, Jacksonville, Florida 32207.

4.    Defendant SCOTT SCHNEIDER ("Defendant Schneider") works in Duval County, Florida, and is employed by Defendant DCPS as its High School Regional Superintendent.

5.    Venue is proper in Duval County, Florida, because the DCPS operates in Duval County, because Ms. Donofrio works for DCPS in Duval County, and because Defendant Schneider works in Duval County. As such, Defendants DCPS and Schneider are within the jurisdiction of this Court.

6.    Plaintiff is a citizen and resident of Duval County, Florida.

---

[10] Ms. Donofrio's claims will be amended after she exhausts administrative remedies for her FCRA and Title VII claims related to the most recent acts of retaliation by Defendants, including but not limited to removing Ms. Donofrio from her classroom as of March 19, 2021, while they investigate vague, false, and retaliatory charges lodged against her because she complained of race discrimination and peacefully objected to the removal of a Black Lives Matter flag from outside her classroom.

7.      This Court has federal question jurisdiction under 28 U.S.C. § 1331 over Ms. Donofrio's

claims under: 42 U.S.C. § 1981, § 1981(a), *et seq.* and § 1983; and 42 U.S.C. § 2000e *et*

*seq.* (1964) Title VII; the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.* (1964) Title

VI; and, U.S. Const. Amend. I., First Amendment.

8.      The court has supplemental jurisdiction under 28 U.S.C. § 1367 over Ms. Donofrio's state

court claims under: the Florida Civil Rights Act, Florida Statute § 760, *et seq.* ("FCRA");

and, Protection of School Speech, Fla. Stat. § 1003.4505.

## COMMON ALLEGATIONS

### A.      *BACKGROUND*

9.      Ms. Donofrio is a white woman, who has been a teacher since 2008.

10.     Since 2012, and until her unlawful, retaliatory removal, Ms. Donofrio has been employed

by DCPS at Robert E. Lee High School (hereinafter "School," "High School" or "Lee High

School") in Duval County, Florida as a teacher.

11.     According to the latest data from the U.S. Department of Education Office for Civil Rights,

as of 2017, the High School's population is 69% Black. However, that same year, 100% of

the students Lee High School expelled were Black.

12.     In the 2015-16 school year, when Ms. Donofrio first started teaching the leadership course

that evolved into the EVAC Movement, the principal was Defendant Schneider. In or about

2019, Defendant Schneider was promoted to High School Regional Superintendent.

13.     Since 2019, Timothy Feagins has been the principal at the High School. Defendant

Schneider is now Mr. Feagins' supervisor.

**B.      *2014-2015: MS. DONOFRIO AND HER STUDENTS CREATE THE EVAC MOVEMENT***

14.     In the 2014-15 school year, Ms. Donofrio was assigned to teach a life skills and speech class. Many of the students assigned to the class were flagged by the High School as "at-risk." As Ms. Donofrio learned about the racism and tragedies that plagued her students' lives – police stops, arrests, incarceration of family members, murders – she invited them to co-designed the curriculum to promote their own professional development, civic engagement, college preparation, and empowerment.

15.     Students in the class read Plato's *The Allegory of the Cave*, a story of prisoners chained in a cave since birth until a liberator enters to unbind their chains and lead them into the light, tasking them with the responsibility to return to liberate others.

16.     Through this lens, they analyzed their own personal chains created by their traumatic experiences with violence, loss, racism, and the criminal justice system. In doing so, the students bonded with one another over their shared experiences and learned to break the metaphorical chains that bound them by telling their stories.

17.     The lessons the students were learning about using their stories and voices to make positive change quickly grew into the EVAC Movement (also referred to as "EVAC" herein). *See* www.evacmovement.org.

18.     "EVAC" is cave spelled backwards.

19.     Toward the end of the school year, the students begged Ms. Donofrio to offer a "part two" course so that students could again have Ms. Donofrio as a teacher. They also wanted to continue their leadership skills. After obtaining approval, Ms. Donofrio created an application for interested students of all genders.

C.    *2015-2016: THE FIRST EVAC MOVEMENT CLASS AT THE HIGH SCHOOL*

20.    While the EVAC Movement started as a generic leadership course at the High School, by

the 2015-16 school year, EVAC was an official class offered for course credit to only Black

male students at the insistence of the new Principal, Defendant Schneider.

21.    Building on the leadership class curriculum, together, Ms. Donofrio and her students

defined the purpose of the class that had become their movement: the EVAC Movement is

a youth-led initiative focused on promoting equitable outcomes for Black and Brown

youth. It empowers youth to channel painful personal tragedies into positive change.

22.    Ms. Donofrio's students did just that.

23.    EVAC's message is one of empowerment. All students and young people are considered

"at-hope" rather than "at-risk." EVAC's message is also one of peace and inspiration. It

believes that youth are more than the circumstances of their childhoods and the racial views

of society, and that they are the impetus for a better, empowered future.

24.    Activities in that first year included:

A.    Inviting police officers to class for student-led roundtables. Through candid

discussions about race and policing, the students were able to make officers aware

of their perspectives of racism, injustice, and violence. The discussions opened a

peaceful dialogue between law enforcement and Black and Brown students at a

time when police violence against Black and Brown lives was at an all-time high.

B.    Participation in marches and peaceful protests for systemic reform and justice for

young Black men killed by the Jacksonville Sheriff's Office and countless other

Black and Brown people who have died at the hands of law enforcement. These

public gatherings often featured Black and Brown EVAC students wearing "I am not a gang member" shirts. ***See* Exhibit "1."**

C.      Decorating Ms. Donofrio's classroom were numerous photos and displays featuring direct and indirect references to Black Lives Matter, police brutality and disparate tragic deaths of young Black men, reflective of the experiences and concerns her students shared with her. These displays were meant to and did signal that her classroom was a safe space for Black, Brown, Indigenous, and other students of color.

25.   As the EVAC Movement class grew together, their activities also grew and expanded to a local and national stage.

**D.   *2016-2017: EVAC GAINED NATIONAL ATTENTION AND ACCOLADES***

26.   In the 2016-17, school year the EVAC Movement started to garner local support, national attention, and accolades. At this point, the EVAC Movement was still a class offered for course credit at the High School.

27.   Since EVAC's creation, its students and co-founder, Ms. Donofrio, have received local and national public recognition including but not limited to:

A.      TEDx Talk "At-Risk or At-Hope?" which can be found at https://youtu.be/RE5A4K5suPo. ***See* Exhibit "2."**

B.      Harvard EdCast Extra Podcast: "Teens Get Real About Inequity in College Access" in 2019 (https://m.soundcloud.com/harvardedcast/edcast-extra-teens-get-real-about-inequity-in-college-access).

C.      Meeting President Obama in Jacksonville, Florida on November 3, 2016 (https://www.jacksonville.com/news/20180530/evac-movement-young-juvenile-justice-advocates-graduate-from-lee-high). ***See* Exhibit "3."**

D.      Meeting Senator John Lewis at Capitol Hill in 2016. ***See* Exhibit "4."**

E.      Presenting at the White House for a policy briefing roundtable as well as testifying on Capitol Hill for U.S. Senate Committee Hearings in 2016. *See* **Exhibit "5."**

F.      National Winners of Harvard's KIND Schools Challenge. *See* **Exhibit "6."**

G.      Meeting with Senator Cory Booker. *See* **Exhibit "7."**

H.      Presenting to the Jacksonville Sheriff's Police Homicide Unit. *See* **Exhibit "8."**

I.      Presenting on four separate occasions at Harvard Graduate School of Education. *See* **Exhibit "9**."

J.      Letter from Senator Marco Rubio congratulating on winning national KIND Schools Challenge. *See* **Exhibit "10."**

K.      Recognition in the press of the hard work of students who were affiliated with the EVAC Movement. *See* **Exhibit "11."**

L.      Recognition from the Jacksonville Mayor and State Attorney's Office.

M.      Publication of the "EVAC Movement Story" in the *Harvard Educational Review* ([https://www.hepg.org/her-home/issues/harvard-educational-review-volume-90,-issue-2/her-article/the-evac-movement-story](https://www.hepg.org/her-home/issues/harvard-educational-review-volume-90,-issue-2/her-article/the-evac-movement-story)) and traveling to Harvard to present their story after winning a national contest.

N.      Hosting on May 18, 2017, an in-class, youth-led event attended by the top officials in the City of Jacksonville, including Mayor Curry, Sheriff Williams. Judge Brian Davis, and top officials from the State Attorney's office – all of whom praised the staggering achievements made by the students that school year.



28.      In 2016, members of the EVAC Movement created its website.

29.     While the EVAC Movement was gaining public success, Defendant Schneider erected barriers for Ms. Donofrio behind the scenes. Other teachers and clubs were not subjected to the same requirements – Defendant Schneider denied Temporary Duty Elsewhere ("TDE") leave for Ms. Donofrio to take students on field trips, like a fully-funded presentation to the Florida Department of Juvenile Justice. Defendant Schneider said there was "no TDE for clubs," while allowing TDE for teachers accompanying other student clubs such as Future Business Leaders of America ("FBLA").

**E.      SUMMER OF 2017: DEFENDANTS SCHNEIDER AND DCPS THREATENED TO CANCEL THE EVAC MOVEMENT CLASS.**

30.     At first, Defendants DCPS and Schneider politely tolerated the EVAC Movement. But as EVAC's notoriety grew, Defendants' tolerance quickly waned.

31.     Despite their incredible successes, in Fall of 2017, Defendants told Ms. Donofrio that her class had to be taught on her planning period or be relegated to a school club or activity "due to budget cuts."

32.     Because the school's seeming censorship of an extraordinarily successful class focused on Black students was of great public importance, Ms. Donofrio posted about the class cancellation on Facebook, and it made the news.[11]

33.     Defendants' public statements contradicted the private reasons it gave Ms. Donofrio for threatening to cancel the course.

34.     It was only after Ms. Donofrio took to social media to advise the public that the EVAC Movement class was in jeopardy that there was a temporary reprieve. Members of the local community pleaded with Defendant DCPS at a school board meeting on August 1, 2017,

---

[11] https://www.jacksonville.com/news/education/2017-07-28/award-winning-evac-movement-not-returning-jacksonville-s-lee-high-school

to keep the class because, as they testified, students in the class who were once considered "at-risk" were now thriving. *See* **Exhibit "12."**

35.    Because of public pressure, from students and other prominent community members, such as Judge Brian Davis,[12] the class was saved, but only temporarily. The last time that EVAC Movement would continue as a class offered to High School's students for credit was in the 2017-18 school year.

*F.    2017-2018 SCHOOL YEAR: AS THE EVAC MOVEMENT GREW, THE HIGH SCHOOL, DEFENDANT DCPS, AND DEFENDANT SCHNEIDER'S UNLAWFUL RETALIATION AGAINST MS. DONOFRIO ALSO GREW*

36.    Despite nearly being canceled, the EVAC Movement continued as a class offered for school credit at High School in the 2017-18 school year.  The threat of cancelling her class, however, was not the only harassment Ms. Donofrio endured.

37.    Though the class was put back on MS. Donofrio's schedule, her students largely were not. Defendant Schneider required Ms. Donofrio and the students to follow arduous and ever-changing processes to enroll in the very class they advocated for the previous summer. Many students were delayed enrollment for months, and many were not enrolled at all. This was a crucial time during the fall semester of their senior year when they would be applying for college. The majority of the students affiliated with the EVAC Movement, who were not permitted to join the class, never ended up applying for college and two did not graduate.

38.    Unlike other teachers seeking reimbursement for class expenses, Ms. Donofrio had difficulty getting basic reimbursements including her out of pocket expenses for the national winners of Harvard's KIND Schools Challenge. Defendants delayed and refused

---

[12] https://www.jacksonville.com/news/education/2017-08-02/federal-judge-davis-reaches-out-city-leaders-about-evac-movement?template=ampart

to provide an invoice to Harvard. Harvard's finance department described its dealings with the High School as unusual in that they had not encountered these issues at any of the other 19 school districts what were KIND finalists.

39.     To harass Ms. Donofrio, Defendant Schneider assigned another teacher to use Ms. Donofrio's classroom during her planning period, even though there were other rooms the teacher could have used. Notably, this was the same planning period that Defendant Schneider suggested Ms. Donofrio use to host EVAC.

### G.     MAY 2018: AFTER A SUCCESSFUL YEAR, DEFENDANTS DCPS AND DEFENDANT SCHNEIDER CANCELLED THE EVAC MOVEMENT CLASS

40.     On May 20, 2018, the first EVAC Movement class graduated.

41.     On May 31, 2018, the media covered their graduation.[13]

42.     Defendant Schneider posted the article and commented, "So proud of these young men. I still remember sitting with Ms. Donofrio my first summer at Lee and discussing how we would make this class happen even with budget concerns. The young men took it to the next level! Go Generals!"[14] *See* **Exhibit "13."**

43.     In that same article, Ms. Donofrio expressed her hopes that the class would continue.

44.     However, on June 1, 2018, Ms. Donofrio received her schedule for the 2018-19 school year, which showed that she had been assigned six speech classes and no EVAC Movement class. School administration did add an all-male leadership course to the schedule of a male history teacher. No explanation was given.

---

[13] https://www.jacksonville.com/news/20180530/evac-movement-young-juvenile-justice-advocates-graduate-from-lee-high?template=ampart

[14] It should be noted that the school mascot for Robert E. Lee High School is "the General," referring to General Robert E. Lee, an avowed white supremacist, an owner of enslaved people and commander of the Confederate States Army during the American Civil War.

**H.**   ***2018-19 SCHOOL YEAR: MS. DONOFRIO CONTINUED SUPPORTING THE EVAC MOVEMENT AS A SCHOOL CLUB EVEN WHILE DEFENDANTS' RETALIATION ESCALATED***

45.     While the EVAC Movement was removed from the High School course offerings in the 2018-19 school year, Ms. Donofrio continued to infuse her speech courses with the same principles that infused the EVAC Movement classes.

46.     The EVAC Movement also continued to exist as a School club and as a general movement. This was the last year that it was a School club. As seen below, the EVAC Movement was no longer listed as a High School club, organization, or activity in the 2019-20 school year:



47.     Defendants DCPS and Schneider's retaliation continued to escalate against Ms. Donofrio during this time.

**I.**   ***MID-NOVEMBER 2018: MS. DONOFRIO'S SUPPORT OF AN EVAC MOVEMENT STUDENT AT THE JACKSONVILLE FAIR WENT VIRAL AND LED TO RETALIATION FROM DEFENDANTS SCHNEIDER AND DCPS***

48.     The harassment and retaliation against Ms. Donofrio intensified on November 3, 2018, after a Lee High School senior who was associated with the EVAC Movement was ejected

from the Jacksonville Fair (the "Fair") for wearing a necklace with a photograph of his

deceased mother around his neck.



49.   Jacksonville Sheriff's Office labeled the student's apparel as "gang-related" and directed

the student to leave immediately.

50.   Ms. Donofrio and other students who were associated with the EVAC Movement

immediately reviewed the Fair policies and reached out to the Fair officials to express

concerns of racial animus as the dress code did not list any restrictions under which the

R.I.P. necklace would have fallen.

51.   Ms. Donofrio posted about the incident on Facebook:



52.   On November 10, 2018, Ms. Donofrio went to the Fair wearing a memorial item without

incident. She posted on Facebook about the disparity in the treatment she received as a

white woman and the treatment her student received. The relevant posts are below:



**Amy Donofrio** is at **The Evac Movement**.
November 9, 2018 · Jacksonville · 🌐

When u lie about ur RACIST rule & get CAUGHT!Watch starting @2:50
#CRYING😂😭 #JacksonvilleFair #BYE✌️



**Amy Donofrio** is with **Dominique Williams** and **35 others** at **The Evac Movement**.
November 10, 2018 · Jacksonville · 🌐

WOW. Instead of an apology & refund to The Evac boys, Gayle Smith Hart (lady representing #JaxFair in last night's News4JAX interview) just posted this, MOCKING them. #PleaseExplain #SHARE🗣️

**Gayle Smith Hart** updated her cover photo.
3 hrs · 🌐



**Amy Donofrio** is at **The Evac Movement**.
November 11, 2018 · Jacksonville · 🌐

DONT SUPPORT THE JAX FAIR 🙅🏽‍♀️😡 Last night I wore my RIP hoodie to the fair to honor veterans & what they fought for, by seeing if the "no memorial apparel" rule applied to people who look like me...Guess not!

‼️OFFICERS took these photos ‼️

As they did, I watched Black youth thrown & dragged for wearing memorial necklaces. It was so ugly & vicious that when I got in my car, I bawled. Jax is THIS how we treat our kids?! 💔

#BOYCOTT #DemandAnswers

BACKSTORY: Last week my student Alan was removed from the fair for wearing a necklace memorializing his mom who died from health issues. JSO called it "gang related." This rule is NOT listed in the dresscode on fair's website nor on the dress code sign at the entrance. AFTER we called to complain, they posted this sign. THIS IS RACIAL PROFILING. https://tinyurl.com/YahooNewsJaxFairRacism



53. In addition to the buzz it generated on social media, this incident was widely discussed by students and faculty.

54. On November 13, 2018, the story of the Fair's R.I.P. ban made national headlines, including *yahoo!life*, which reported on the racial profiling implications of the ban.[15]

55. The following day, on November 14, 2018, Defendant Schneider announced he was implementing a ban on all R.I.P. apparel, which he, like the Jacksonville Sheriff's Office, wrongly claimed constituted gang paraphernalia. During the morning announcements, Defendant Schneider told all students that if they wore any R.I.P. apparel, whether it be socks, jewelry, or clothing, they would be subject to discipline, including suspension. Defendant Schneider failed to identify to which gang(s) the images related, how the images encouraged violence, or which policy the R.I.P. apparel violated.

56. After the announcement of the ban, students and faculty were in a frenzy. Many voiced concerns that the ban was directed at the student who went to the Fair and Ms. Donofrio.

---

[15] https://www.yahoo.com/lifestyle/teens-necklace-featuring-photo-deceased-mother-got-kicked-florida-fair-associated-bad-behavior-182716606.html

The EVAC students requested a copy of the so called "policy" that required the ban. No policy existed.

57.   In fact, the R.I.P. jewelry and apparel, a form of expression used by Black students is in no way related to a gang but rather a personal tribute to a lost loved one. A student e-mailed Defendant Schneider to let him know that R.I.P. jewelry and apparel was part of his culture and it is how some African Americans grieve. Defendant Schneider nonetheless continued his ban of the images, demonstrating gross cultural ignorance.

58.   Upon information and belief, Black students were thereafter sent home, threatened with discipline, and disciplined for insignia that memorialized their loved ones.

59.   Defendant Schneider's anger toward Ms. Donofrio was palpable at a faculty meeting on November 14, 2018, the same day he made the announcement banning R.I.P. jewelry.

60.   During the meeting, he made highly inflammatory comments directed at Ms. Donofrio. Defendant Schneider told the entire faculty, while occasionally glancing at Ms. Donofrio that, "there was *one* faculty member who could not go to administration," and "*one* who could not be an adult and come talk to us," and "I would like to think that [Robert E. Lee High School] is a family but every family has that *one* cousin we don't want to claim." The faculty present stared at Ms. Donofrio the whole time.

61.   Toward the end of his rant, Defendant Schneider said that the problem was that the High School was no longer predominately white, but maybe if "they" – clearly referring to white parents – observed how he handled these policies – clearly referring to the ban on R.I.P. apparel and situation at the Fair – that *their kids* would come back to the school.

62.   Though Defendant Schneider banned Ms. Donofrio's students who identified as members of the EVAC Movement from wearing R.I.P. apparel to honor loved ones lost to violence,

in a twist of irony, and DCPS hosted a "Day of Hope" on November 15, 2019, to honor family and friends of students who have died, exactly one year after Schneider's ban on R.I.P. apparel.

***J.    DECEMBER 4, 2018: DEFENDANTS HELD A DISCIPLINARY MEETING FOR MS. DONOFRIO BECAUSE OF A PUBLIC FACEBOOK CALL-TO-ACTION, CONTINUED TO HARASS HER, CANCELLED THE EVAC MOVEMENT AS A SCHOOL CLUB, AND RELEGATED IT TO A STUDENT ACTIVITY***

63.    On November 28, 2018, there was a Facebook call-in event organized by Jacksonville Community Action Committee. The event was to protest the racial policies of the School, namely the ban on R.I.P. jewelry and apparel.



64.    On November 29, 2018, Defendant Schneider scheduled a meeting for Ms. Donofrio. During the meeting, Ms. Donofrio learned she was being considered for discipline.

65.    The disciplinary meeting proceeded on December 4, 2018. In attendance were Defendant Schneider; legal counsel for Defendant DCPS, Brian McDuffie; Chief of Schools, Victoria Schultz; Regional Superintendent, Corey Wright; Ms. Donofrio; and, her union representative.

66.    During the disciplinary meeting, Ms. Donofrio was accused of fundraising without approval. The only evidence the principal provided was a printout of the EVAC

Movement's public website listing donation options. However, the union representative pointed out that nothing on the website listed Ms. Donofrio as the one engaged in fundraising.

67. After the union representative vocalized the lack of evidence, Defendant Schneider then changed topics to discuss how the EVAC Movement should be disassociated completely from Defendant DCPS, citing the EVAC Movement's "problematic messaging" and that it caused the loss of business sponsors to the High School.

68. Ms. Donofrio denied any wrongdoing and contends that Defendants' actions, like its other adverse actions against her, were retaliatory. However, the meeting continued.

69. While the EVAC Movement had not been a class at the High School since the prior school year, Defendant Schneider also requested that Ms. Donofrio consider not having the EVAC Movement as a club at the High School. The meeting was very intimidating and anxiety-provoking for Ms. Donofrio, as it was not customary for the Chief of Schools and legal counsel to be present at such meetings.

70. The 2018-19 school year was the last time that the EVAC Movement was a club. Since then, it has been relegated to a school activity.

71. Ms. Donofrio advised everyone at the disciplinary meeting that she had just learned that the students who identified as EVAC Members were scheduled to present at Harvard and to the Department of Justice in Washington, D.C. The media reported this remarkable accomplishment: Harvard selected students who identified as EVAC Members from a nationwide pool to become youth advisors. They were the only Black male students. During a news interview, one student discussed his negative feelings about being stereotyped as a gang member. Ms. Donofrio posted about it on Facebook:



72.     Defendant Schneider confirmed that she could attend those events but advised that she had
        to use her own paid time off. Chief of Schools, Victoria Shultz, interjected and said that
        while permission was granted for Ms. Donofrio's attendance, she strongly warned against
        traveling on overnight trips with young Black males.

73.     Despite Defendants' harassment, attempts to embarrass Ms. Donofrio, and their retaliation,
        Ms. Donofrio was not disciplined after the disciplinary meeting on December 4, 2018.

**K.     *DECEMBER 7, 2018: DEFENDANT SCHNEIDER AND DCPS OPENED AN
        ALLEGED CASE OF MISCONDUCT AGAINST MS. DONOFRIO***

74.     Following the student's interview, the threat to cancel the EVAC Movement class, and
        Defendants' failed attempt to discipline Ms. Donofrio for "fundraising" issues, Defendant
        Schneider opened an alleged misconduct investigation on Mr. Donofrio on or about
        December 6, 2018.

75.     On or about December 6, 2018, Defendant Schneider alleged that Ms. Donofrio engaged
        in misconduct regarding a student who participated in a class assignment. The assignment
        was for students to share a personal defining experience – it could be about themselves, or
        it could be about a book or a movie with which they identified. Ms. Donofrio had never
        force students to share personal experiences if they were uncomfortable doing so; rather,
        she provided a safe space in her classroom for those who did want to share.

76.     Defendant Schneider alleged that Ms. Donofrio's assignment constituted misconduct. Ms. Donofrio denied any wrongdoing, denied any misconduct, denied that students were made to feel uncomfortable, and provided the information that Defendant Schneider requested – the class assignment and grading rubric.

77.     Defendant Schneider forced students to write statements as part of the investigation against Ms. Donofrio. Upon information and belief, the student statements did not support any misconduct. There was one anonymous student statement that said the student might have felt uncomfortable.  The allegedly impacted student was told to write a statement and the statement confirmed there was not misconduct.

78.     Notwithstanding, on December 11, 2018, Defendant Schneider sent an e-mail to Broderick Edwards, who works for Defendant DCPS in Professional Standards, to move forward with a misconduct investigation as Mr. Edwards deemed necessary. Professional Standards did not make any findings of misconduct against Ms. Donofrio.

79.     Once again, Defendant DCPS and Schneider's attempts at disciplining Ms. Donofrio failed.

**L.     *JANUARY 2019: MS. DONOFRIO REPORTED THE SEVERE AND PERVASIVE RETALIATION TO DR. GREENE, THE SUPERINTENDENT FOR DEFENDANT DCPS***

80.     In January 2019, a community leader, Ceil Pillsbury-Schellenberg, reached out to Superintendent for Defendant DCPS, Dr. Diana Greene ("Dr. Greene"), on Ms. Donofrio's behalf.

81.     On March 8, 2019, Ms. Donofrio met with Dr. Greene.

82.     During the meeting, Ms. Donofrio shared the success of her students and the upcoming trip to Harvard with Ms. Greene. Ms. Donofrio also reported the harassment and retaliation she

had faced in addition to the racial discrimination, harassment, and retaliation her students experienced under the leadership of Defendants DCPS and Schneider.

83.    Ms. Donofrio told Dr. Greene she feared retaliation for having this meeting. In response, Dr. Greene repeatedly told Ms. Donofrio, "I can't prevent it," "I'm not in the building with you," and that "I stand behind my principals." She did not offer any recourse to Ms. Donofrio.

**M.    MARCH 2019: DEFENDANTS' RELENTLESS RETALIATION CONTINUED AFTER THE EVAC MOVEMENT PRESENTED AT HARVARD AND WAS FEATURED IN NATIONAL MEDIA**

84.    During the week of March 11-18, 2019, Ms. Donofrio traveled with EVAC Movement students who were presenting at the Harvard Graduate School of Education. They presented in the classes of Rick Weissbourd, Senior Lecturer of Education, and Gretchen Brion-Meisels, Lecturer of Education.






85.     As a result, the group was featured in a *New York Times* article about college admissions[16] and as the main feature of *Good Morning America* on March 18, 2019.[17]

 

86.     After Ms. Donofrio returned to school, Defendant Schneider responded by engaging in further retaliatory conduct:

A.      Defendant Schneider emailed Ms. Donofrio that her position was cancelled due to "budget cuts." *See* Exhibit "14" (the e-mail dated March 25, 2019, from Defendant Schneider to Ms. Donofrio stating, "Due to Budget cuts, I need you to teach ELA next school year…").

B.      Defendant Schneider reassigned Ms. Donofrio to teach English IV/British Literature.

C.      Defendant Schneider advised Ms. Donofrio she was no longer permitted to utilize professional leave to be on the City's Task Force.

D.      Defendant Schneider denied Ms. Donofrio use of professional leave days to attend the Harvard Racial Equity Professional Development program. Other teachers were

---

[16] https://www.nytimes.com/2019/03/16/opinion/college-admissions-scandal.html
[17] https://abc.com/shows/good-morning-america/video/vdka8784692

treated more favorably. One example is that Defendant permitted other teachers at the High School to take professional development days for Senior Day at the Zoo.

N. *2019-2020 SCHOOL YEAR: NEW PRINCIPAL, SAME RETALIATION. TIMOTHY FEAGINS BECAME THE NEW HIGH SCHOOL PRINCIPAL, REJECTED PRIVATE FUNDING FOR THE EVAC MOVEMENT, AND MS. DONOFRIO'S CLASSROOM WAS VANDALIZED.*

87.   As of about 2019, Timothy Feagins ("Mr. Feagins") was the new principal of the High School. The former principal, Defendant Schneider, was promoted to his current position of High School Regional Superintendent. Defendant Schneider is Mr. Feagins' supervisor.

88.   In the summer of 2019, School Board Member Charlotte Joyce notified Mr. Feagins that Ms. Donofrio had received an offer to fund the EVAC Movement class. Mr. Feagins' secretary called Ms. Donofrio to schedule a meeting to discuss the funding opportunity.

89.   Despite the retaliation under Defendant Schneider's supervision, and Defendant DCPS' disavowal of the EVAC Movement, Ms. Donofrio was hopeful that with a new principal, and with a private funder, the EVAC Movement could be reinstated as a class at the High School.

90.   On July 11, 2019, Ms. Donofrio arrived at the meeting with the High School and the students who affiliated with the EVAC Movement only to find that her classroom had been vandalized and the locks were changed. Moreover, the bottom part of her bulletin board displaying the EVAC Movement's award-winning Harvard project was torn down and some elements were found in the trash. Photographs of her students' accomplishments were stripped from her cabinets and ruined. Her locked cabinet was opened and several items inside were out of place. Many laminated EVAC Movement cards, awards, and mementos were thrown in the trash.

91.    Once she gained access to her classroom and saw the extent of the damage Ms. Donofrio complained to Mr. Feagins about the vandalism. She was also shocked.

92.    Notwithstanding the funding opportunity, Mr. Feagins rejected it for the EVAC Movement class.

93.    On July 24, 2019, Mr. Feagins e-mailed Ms. Donofrio that the EVAC Movement would only continue to function as a club at the High School. *See* **Exhibit "15."**

94.    Ms. Donofrio then made a second attempt the get funding approved. Mr. Feagins asked Ms. Donofrio to schedule a meeting with the funder and the then-Chief of Schools, Wayne Greene, to discuss logistics. At the meeting. Wayne Greene told the funder that the funding could not go to the EVAC Movement, but that it could fund another program instead.

**O.    *LEE HIGH SCHOOL ARBITRARILY REQUIRED MS. DONOFRIO TO RELOCATE CLASSROOMS DESPITE ITS KNOWLEDGE OF HER ONGOING MEDICAL ISSUES AND CONDONED THE DESTRUCTION OF THE AWARD-WINNING EVAC MOVEMENT BULLETIN BOARD***

95.    As noted above, during the vandalization of Ms. Donofrio's classroom on or about July 11, 2019, before the beginning of the school year, the bottom part of the bulletin board displaying the EVAC Movement's award-winning Harvard project was torn down and some elements of the project were damaged or in the trash.

96.    The bottom part of the "#YourStoryIsMine" bulletin board shown below that was destroyed was especially devastating to Ms. Donofrio because it displayed the award-winning project that the Ms. Donofrio and the students affiliated with the EVAC Movement created in 2017 and submitted to Harvard. It was also incredibly popular at the School – students would share their stories if they were comfortable doing so, put them up next to their pictures, and other students could use the "like" stickers to indicate they

supported what the other students were going through, or they could use the heart stickers to indicate that they could relate.



97.     Also, before the start of the 2019-20 school year, Defendants relocated Ms. Donofrio to a different classroom, allegedly because she was going to teach English. However, the teacher who took her classroom was also assigned to the English department.

98.     Because Ms. Donofrio was suffering from medical issues, she could not lift or move heavy items. She was promised additional assistance with unpacking her classroom, but it never came. The day before school opened, Defendant DCPS provided Ms. Donofrio with student volunteers, but by then she had already suffered a re-injury of her spine and required medical leave.

99.     Due to her medical condition, Ms. Donofrio missed the first three weeks of school in the fall semester of 2019.

100.    When Ms. Donofrio returned from medical leave on August 29, 2019, she met with Mr. Feagins to report further co-worker harassment that occurred immediately upon her return. She learned during this meeting that no progress had been made on the vandalism complaints. Mr. Feagins assured her and her students that the board would be restored to its pre-vandalized condition.

101.    Notwithstanding Mr. Feagins' promises, on September 6, 2019, one of Ms. Donofrio's coworkers found the EVAC Movement "#YourStoryIsMine" lion banner that hung above the award-winning bulletin board crumpled up in the copy room on the floor.

102.    Ms. Donofrio complained to Mr. Feagins again, who told her that the responsible teacher was another teacher, Monique Bell. Instead of disciplining the bad actor, Mr. Feagins told Ms. Donofrio she could no longer utilize the bulletin board. He then granted use of the bulletin board to the faculty member who he admitted had destroyed it.

103.    On September 18, 2019, Ms. Donofrio post the following on social media:



104.    The message from the School was clear: the retaliation would continue that school year.

**P.    MS. DONOFRIO INCORPORATED THE EVAC MOVEMENT AS A FLORIDA NOT-FOR-PROFIT CORPORATION**

105.     Because Defendants canceled the EVAC Movement class, turned it into a club, and then relegated the program to a student activity, and because of the increasing retaliation and harassment, Ms. Donofrio incorporated EVAC Movement, Inc. on September 16, 2019.

106.     Part of the reason Ms. Donofrio incorporated the EVAC Movement as a Florida not-for-profit corporation is because Defendant Schneider told a funder at a meeting on August 1, 2019, that the issue with accepting funding for the EVAC Movement was that its fiscal sponsor was a church. However, the funding would have gone directly to Defendant DCPS, not to the EVAC Movement or a fiscal sponsor.

107.     Ms. Donofrio's social media post about incorporating the EVAC Movement is below:



**Q.     HIGH SCHOOL APPLIED ITS VISITOR POLICY DIFFERENTLY TO MS. DONOFRIO AND HER BLACK VISITORS**

108.     On September 13, 2019, Ms. Donofrio's birthday, Wade Johnson ("Mr. Seven"), a classroom volunteer with the EVAC Movement since 2014, attempted to visit Ms. Donofrio during her lunch period bringing her a balloon and birthday card. As usual, he went to the front office. A teacher and dean were covering the front desk because the staff were away from their desk. The teacher and dean told Mr. Seven that they did not think that the High School was allowing Ms. Donofrio to have visitors any longer. Lee High School also denied Mr. Seven's requests to leave his balloon and card for Ms. Donofrio.

Finally, after an office secretary noticed the harassment, she provided Mr. Seven with a visitor pass.

109. On September 21, 2019, the choir teacher had guests during the day and was not required to get pre-approval for his guests, and his guests were not harassed. The High School did not attempt to keep the choir teacher's guests from coming into the School to visit.

110. On January 24, 2020, Robert Hudson ("Mr. Hudson"), Assistant Principal, emailed Ms. Donofrio reminding her that all visitors to the school must be approved and have the appropriate background checks through Defendant DCPS prior to coming to the school. *See* **Exhibit "16."**

111. However, regardless of what Mr. Hudson stated the High School policy was on visitors, it was clearly applied differently to Ms. Donofrio's visitors.

112. As such, on January 26, 2020, Donofrio responded to Mr. Hudson that his policy of needing pre-approval for visitors has been used to discriminate against her Black EVAC Movement alumni students. She reiterated that her prior discrimination reports to the Superintendent, Dr. Greene, from March 8, 2019, had gone unanswered.

## R. *EVENTS THAT LED UP TO MS. DONOFRIO'S EEOC CHARGE OF DISCRIMINATION*

113. Ms. Donofrio's coworkers harassed her and created an increasingly hostile work environment in the month leading up to when she filed her EEOC Charge of Discrimination.

114. At Mr. Feagins' direction, Ms. Donofrio reported the harassment of a coworker, Monique Bell, classroom and bulletin board vandalism. Two incidents involved Monique Bell – one was when she crumpled the "YourStoryIsMine" bulletin board banner. The other was when

Monique Bell accused Ms. Donofrio of taking her parking spot and created a public scene, yelling at and humiliating Ms. Donofrio.

115.   In a complaint to Mr. Feagins dated September 9, 2019, Ms. Donofrio pled with Mr. Feagins to intervene as she found herself "in a work environment that is becoming increasingly hostile."

116.   Mr. Feagins responded to Ms. Donofrio on September 13, 2019, telling her that he spoke with Monique Bell and reminded her of the parking lot rules. However, he did not address any of the other issues.

117.   Because of the years of retaliation, harassment, and hostile work environment – combined with the anxiety, degradation, and hostility Ms. Donofrio felt when parking, signing into work, attending faculty meetings, wondering who was on the other line when the classroom phone rang, checking her e-mail, walking to her classroom, or anticipating intercom announcements – she felt that she had no other recourse but to file an EEOC Charge of Discrimination.

### S.   MS. DONOFRIO FILED AN EEOC CHARGE OF DISCRIMINATION

118.   On September 24, 2019, Ms. Donofrio filed an EEOC Charge of Discrimination.

119.   That same day, Ms. Donofrio posted about the EEOC Charge of Discrimination on Facebook:



120.    Even following the filing of her EEOC Charge of Discrimination, Defendant DCPS
        continues to retaliate, harass, and embarrass Ms. Donofrio.

**T.    *2020-2021 SCHOOL YEAR: MS. DONOFRIO HUNG A BLACK LIVES MATTER
        FLAG OUTSIDE OF HER CLASSROOM AND DEFENDANTS ASKED HER TO
        TAKE IT DOWN FOR THE FIRST TIME***

121.    The Black Lives Matter movement has been a common topic in the High School.
        Discussions intensified after George Floyd was murdered on May 25, 2020.

122.    In solidarity for her Black and Brown students, in October of 2020, Ms. Donofrio
        purchased a Black Lives Matters flag to be displayed outside her classroom, above her
        door.

123.    The Black Lives Matter flag was part of a larger collection of other signs that read, "Hate
        has no home here." A poster supporting Trayvon Martin containing the phrase "Black
        Lives Matter" had been displayed in Ms. Donofrio's classroom for years.

124.    Ms. Donofrio sought to create a safe space for students to discuss tumultuous racially
        charged topics circulating in the media, in the school, and in their own lives. Several
        students shared some of the hate speech they had recently endured throughout the 2020
        Presidential election. As always, Ms. Donofrio offered a calm response and open mind. A
        photograph of the door leading into Ms. Donofrio's classroom and the flag is below:



125.   As also seen above, another social cause posted in Ms. Donofrio's doorway was a "Hate Has No Place Here" sign, supporting the LGBTQ+ community. Defendant DCPS openly supports the LGBTQ+ community and social cause. Below is a Defendant DCPS-branded poster for the "All in for Safe Schools" campaign that advises students that when they see staff wearing the campaign-branded badge, that those "…adults are allies to ALL students, including those identifying as LGBTQ. They are supportive of students' identity needs. They respect the diversity of every student on campus…"



126.   On or about October 30, 2020, Assistant Principal William Spell ("Mr. Spell") told Ms. Donofrio that while no one had complained, he had a concern her Black Lives Matter sign might "violate policy." Ms. Donofrio asked for copies of the policy. *See* **Composite Exhibit "20."**

127.   Mr. Spell was unable to provide a relevant DCPS policy, memo, or directive that addressed a Black Lives Matter flag or sign. Instead, Mr. Spell sent Ms. Donofrio a memo on student expression, which did not apply to her as faculty. Mr. Spell also sent a vendor policy that was inapplicable. *See* **Composite Exhibit "20."**

128.   When Ms. Donofrio responded to explain that these policies did not regulate faculty and to ask if there was in fact a relevant policy, Mr. Spell stated in an e-mail to Ms. Donofrio and Mr. Faegins, "Unless they [Office of Policy and Compliance] have provided you with different information than I have provided, the flag needs to come down when you return." *See* **Composite Exhibit "20."**

129.   Mr. Spell let Ms. Donofrio know that he would reach out to the Office of Policy and Compliance. *See* **Composite Exhibit "20."**

130.   Mr. Spell never followed up, Mr. Feagins did not respond, and no one directed the removal of the flag. Given this, and the fact that no one could identify an applicable policy, Ms. Donofrio understood that the flag could remain outside of her classroom.

131.   For several months, the flag remained exactly where it was displayed without incident.

132.   Both Mr. Feagins and Mr. Spell had been in Ms. Donofrio's classroom without commenting about the flag from November 2020, until February 2021.

133.   In February of 2021, Mr. Spell evaluated and observed Ms. Donofrio's teaching. Three Black Lives Matter flags were on display during the observation. Mr. Spell made no comment about the flags during this evaluation and observation.

**U.     *2021: NAME CHANGE OF ROBERT E. LEE HIGH SCHOOL SPARKED DEBATE AND HATE SPEECH FROM THE COMMUNITY AT PUBLIC MEETINGS***

134.   Toward the end of February 2021, the High School had numerous meetings about changing the school's name, which currently honors Robert E. Lee, a white supremacist, owner of enslaved people and commander of the Confederate States Army during the American Civil War.

135.   The School's mascot is the "General," referring to Robert E. Lee himself, and Defendants refer to the students as the "Generals." Below is a mural at the High School, which glorifies

General Robert E. Lee and his role to defend the Confederacy and all it represented in the Deep South, including slavery:



136.    The name change was a pressure point for students, faculty, and the community. This is part of a wave of change across the country in the wake of the murder of George Floyd and the Black Lives Matter movement. Communities are calling for municipalities and schools to change the names of places that honor and uplift the Confederacy and for the removal of Confederate monuments and statues. This is not to erase history; rather, it is to start to heal the generational scars, traumas, and violence of slavery. Constant reminders of the Confederacy, racism, and slavery is harmful to communities of color. The CDC Director, Dr. Rochelle   Walensky, recently issued a statement declaring that "…racism is a serious public health threat that directly affects the well-being of millions of Americans."[18]

---

[18] https://www.cdc.gov/media/releases/2021/s0408-racism-health.html

137.   As part of the name change process, Defendant DCPS held public meetings which were attended by individuals from the community, some who spewed hate speech directed at Black and Brown people.

138.   Ms. Donofrio recorded some of the public testimony at the High School's public name change meetings and posted a compilation of the recordings on Facebook.[19]

139.   In particular, the following abhorrent and shocking hate speech directed at Black and Brown people from the various meetings included:

   A.   "Jesus was never against slavery. In fact, he said Slaves have an obligation to obey their masters!"

   B.   "You cannot cancel history!"

   C.   "If you think this high school is having problems, how long has it been African American?"

   D.   "I am here to stand up for Robert E. Lee!"

## V.   *MS. DONOFRIO REPORTED THE HATE SPEECH TO THE SCHOOL BOARD*

140.   On Friday, March 19, 2021, Ms. Donofrio called a DCPS School Board Member, Warren Jones, to make a formal complaint on another topic. Ms. Donofrio explained that the School's custodians were being discriminated against because they are Black.

141.   Ms. Donofrio reported that Defendant DCPS instructed the all-Black custodial staff at Lee High School to stay away from public name change meetings and to stay in the cafeteria for the duration of the meetings.

142.   Ms. Donofrio stated to Mr. Jones that this was a racially discriminatory practice. She also formally reported and complained that the process to change the name of the School was

---

[19] https://www.news4jax.com/news/local/2021/03/24/removal-of-lee-high-teachers-blm-flag-sparks-student-response/?fbclid=IwAR287tU0E_ltvT8QuLHOh7bcNriO8TfrZDbHwUczTjvi1F1qOAA_rfvlbeg

damaging to students. She stated that other schools had decided to change the name of schools without allowing days of opportunities for white community members to spew hate speech. Ms. Donofrio explained that Defendant DCPS's process was damaging to the students and the students had no voice in the process.

143.   Ms. Donofrio's call on March 19, 2021, with Mr. Jones ended around 4:00 p.m.

144.   In sum, Defendant DCPS silenced Black voices at the meeting, disregarded the welfare of the Black and Brown students, and gave white community members a platform for hate speech.

## W.   HIGH SCHOOL PRINCIPAL, MR. FEAGINS, ORDERED MS. DONOFRIO TO TAKE DOWN HER BLACK LIVES MATTER FLAG

145.   On Friday, March 19, 2021, at 4:30 p.m., just half an hour after Ms. Donofrio spoke with a School Board Member, Mr. Feagins told Ms. Donofrio that she needed to meet with him on Monday, March 22, 2021, at noon, which was a teacher planning day.

146.   Over that weekend of March 20-21, 2021, Ms. Donofrio's social media posts went viral on Twitter, which showed racially charged comments made at a public name change meeting. Of note was the video of the white High School alumnus at the public name change meeting who made the racist comment that "…slaves have an obligation to obey their masters!" went viral. That alumnus reached out to Defendant DCPS to complain about Ms. Donofrio's Black Lives Matter flag.

147.   In an email from Mr. Feagins and Ms. Donofrio on March 23, 2021, Mr. Feagins told Ms. Donofrio she had until end of the day to remove the Black Lives Matter flag or he would have all the custodial staff, who are Black, remove it for her.

148.   During this time, Ms. Donofrio was also made aware of the memorandum below, titled "Employee Expressions of Social Movements or Causes," that was released on March 19,

2021. However, it was dated December 15, 2020. By its own admission, Defendants admit that Black Lives Matter is not political activity.



149.    Ms. Donofrio did not remove the Black Lives Matter flag hanging outside and above her classroom door.

**X.    *SCPS ADMINISTRATORS TOOK DOWN MS. DONOFRIO'S BLACK LIVES MATTER FLAG AND ASSIGNED MS. DONOFRIO TO "TEACHER JAIL" INDEFINITELY WHILE IT INVESTIGATES ALLEGED DISCIPLINE THAT IT REFUSES TO DEFINE***

150.    After Ms. Donofrio failed to remove her flag, it was removed at Mr. Feagins' direction. Upon information and belief, Mr. Feagins physically removed it.

151.    Defendants assigned Ms. Donofrio to "teacher jail" immediately following her refusal to remove her Black Lives Matter flag. Her current assignment is to report to Bulls Bay Warehouse.

152.    Bulls Bay Warehouse is a warehouse that is colloquially referred to as "teacher jail." There are no assignments. Ms. Donofrio reports for duty but has no work assignments. Since Ms. Donofrio was reassigned to "teacher jail," she has not taught a class.

153.    On April 7, 2021, Defendants seized Ms. Donofrio's DCPS-assigned laptop computer, advising Ms. Donofrio she was being investigated for alleged "poor judgment," "inappropriate communication with or in the presence of students," and "dishonesty in professional dealings." However, Defendant DCPS refuses to provide Ms. Donofrio with any specificity.

## PROTECTED ACTIONS

154.    Ms. Donofrio engaged in protected activity, including but not limited to:

A.    Complaining to Mr. Feagins about the classroom vandalism;

B.    Complaining to Dr. Greene, the Superintendent for Defendant DCPS, about the racial discrimination at the High School;

C.    Filing an EEOC Charge of Discrimination;

D.    Founding the EVAC Movement;

E.    Actively participating in and supporting the EVAC Movement and its affiliated student members since its establishment;

F.    Speaking out about racial injustice and racial discrimination including but not limited to:

i.    The removal of a student at the Jacksonville Fair and its ban on R.I.P. jewelry and apparel.

ii.    The High School's ban on R.I.P. jewelry and apparel.

iii.    The handling of the High School's name change from Robert E. Lee High School to something else that does not glorify and uplift Confederacy and slavery.

iv.    The cancelation of the EVAC Movement as a class offered for course credit to the School's students.

v.    Turning the EVAC Movement into a school club after canceling the class, and later relegating it to a school activity.

vi.    Speaking up about and against repeated unfounded disciplinary actions.

G.    Refusing to support Defendants' racist dress code policies.

H.    Refusing to follow Defendants' arbitrary and capricious policies related to flags.

I.    Reporting issues to School Board Members, including but not limited to on March 19, 2021, when Ms. Donofrio called School Board Member, Warren Jones, to make a formal complaint about how the School's custodians were being discriminated against based on race and being excluded from public hearings on the name change.

J.    Ms. Donofrio's opposition and complaints about the School's discriminatory ban on R.I.P. jewelry and apparel; and,

K.    Ms. Donofrio's social media posts on matters of great public importance, including but not limited to, racism and racial discrimination.

**ADVERSE TREATMENT**

155.    Defendants DCPS and Schneider subjected Ms. Donofrio to adverse employment treatment which includes, but is not limited to:

A.      Denying reimbursement for materials for her EVAC Movement class;

B.      Threatening disciplinary action against her for allegedly fundraising for the EVAC Movement;

C.      Denying Temporary Duty Elsewhere ("TDE") leave to attend any additional City Task Force meetings after March 8, 2019, which is when Ms. Donofrio met with Dr. Greene;

D.      Denying TDE leave to attend a Harvard racial equity training;

E.      Subjecting Ms. Donofrio to another misconduct investigation in December of 2018;

F.      Canceling the EVAC Movement as a class offered for course credit to the School's students;

G.      Turning the EVAC Movement into a school club after canceling the class, and later relegating it to a school activity;

H.      Needlessly relocating Ms. Donofrio's classroom;

I.      Failing to provide timely or adequate assistance to move her classroom despite known medical restrictions;

J.      Having her photographs ripped from her cabinets and thrown away;

K.      Having the contents of her cabinets ruined;

L.      Having her bulletin board with stories from students affiliated with the EVAC Movement ripped off, crumpled up, and thrown on the floor;

M.      Indefinitely transferring her to the Bulls Bay Consolidated Warehouse, also known as "Teacher Jail";

N.      Not permitting people affiliated with the EVAC Movement, including alumni, to visit her or her classroom at the School.

O.     Subjecting Ms. Donofrio's Black and Brown visitors to a harsher policy, or de facto policy, and background checks as compared to white visitors and visitors of other teachers;

P.     Unfairly denying personal leave time and expense reimbursements as compared to other teachers;

Q.     Subjecting Ms. Donofrio to repeated unfounded investigations and to reputational harm;

R.     Including false and unfounded complaints, allegations, investigations, and discipline in her personnel file;

S.     Subjecting Ms. Donofrio to a policy, pattern, and practice of treating similarly situated employees who do not participate in Black Lives Matter activities and who do not speak out against Defendants' discriminatory conduct targeting students affiliated with the EVAC Movement and its policies more favorably than those who do;

T.     Applying employment policies such as anti-discrimination and discipline in a disparate and selective manner;

U.     Removing Ms. Donofrio's Black Lives Matter flag from her classroom without a policy directive;

V.     Infringing on Ms. Donofrio's free speech;

W.     Assigning Ms. Donofrio to Bulls Bay Consolidated Warehouse, where she is isolated from all contact with her peers and her students; and,

X.  Retaliating against Ms. Donofrio and other educators who support her, creating and condoning an environment at the High School and the school district that intimidates other employees, chills their rights, and further isolates Ms. Donofrio.

156. These actions are continuing in nature.

157. Ms. Donofrio has suffered health and anxiety issues as well as other damages.

158. Ms. Donofrio seeks an injunction to be returned to her position as a teacher.

159. Ms. Donofrio seeks an injunction to enjoin Defendants from preventing the display of a Black Lives Matter flag in her classroom.

160. Ms. Donofrio advises that the actions, as described in this complaint, support racial animosity towards Black and Brown people, Ms. Donofrio's support for her Black and Brown students, her support of Black Lives Matter, the creation of the EVAC Movement as a class and later as club and school activity, and Ms. Donofrio's courage to stand up for racial injustice.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

161. Ms. Donofrio has exhausted her administrative remedies for the causes in this Complaint prior to the filing of this action.

162. Ms. Donofrio timely filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") as well as with the Florida Commission on Human Relations ("FCHR") on September 24, 2019. (*See* **Exhibit "18"**).

163. Ms. Donofrio received a Right to Sue Notice from the EEOC that was dated January 13, 2021, and timely filed this action within 90 days plus 3 days for mailing. (*See* **Exhibit "19"**).

164.    It has been more than one-hundred eighty (180) days since the filing of Ms. Donofrio's Charge of Discrimination with FCHR.

165.    This lawsuit is filed within 90 days, plus three days for mailing, of Ms. Donofrio's receipt of the EEOC's Right to Sue Notice.

166.    Ms. Donofrio has exhausted her rights and remedies before bringing her claims herein. This lawsuit will be amended to timely incorporate discrimination and retaliation allegations subsequent to those contained in Ms. Donofrio's September 24, 2019, EEOC Charge of Discrimination.

<u>**COUNT I**</u>
**<u>RETALIATION IN VIOLATION OF 42 U.S.C.  §§ 1981, 1981(a) and § 1983</u>**
**<u>(AGAINST DCPS)</u>**

Ms. Donofrio incorporates by reference all allegations of this Complaint in paragraphs 1 to 166 as if set forth fully herein.

167.    Defendant DCPS is an employer within the meaning of 42 U.S.C. § 1981 and § 1983.

168.    Plaintiff, Ms. Donofrio, is a white woman, subject to the protections of 42 U.S.C. § 1981 and § 1983.

169.    Ms. Donofrio engaged in protected activity as set forth in Paragraph 154 of this complaint.

170.    Ms. Donofrio suffered adverse actions as set forth in Paragraph 155 of this complaint.

171.    Ms. Donofrio has been subjected to a pattern of retaliation, including those set forth in 155.

172.    Ms. Donofrio contends that her protected activity and adverse employment actions are causally related.

173.    Ms. Donofrio has exhausted all administrative remedies prior to bringing the claims in this lawsuit.

174. By and through the conduct described above, Defendant DCPS permitted a pattern and practice of unlawful retaliation by allowing Ms. Donofrio to continue to be subjected to retaliation in violation of 42 U.S.C. §§ 1981, 1981(a) and § 1983.

175. Defendant DCPS knew or should have known that Ms. Donofrio was being retaliated against in violation of 42 U.S.C. §§ 1981, 1981(a) and § 1983.

176. Despite said knowledge, Defendant DCPS failed to take any remedial action.

177. By and through the conduct described above, Defendant DCPS permitted a pattern and practice of unlawful retaliation by permitting Ms. Donofrio to be subjected to continuing retaliation in violation of 42 U.S.C. §§ 1981 and § 1983.

178. Ms. Donofrio has suffered damages as a result of Defendant DCPS' conduct, by and through its agents, employees and/or representatives.

179. As a result of Defendant DCPS' conduct, Ms. Donofrio has suffered general and compensatory damages.

180. As a further result of Defendant DCPS' conduct, Ms. Donofrio has retained the undersigned law firm as her counsel.

181. Ms. Donofrio requests that she be awarded reasonable attorneys' fees and costs of suit pursuant to 42 U.S.C. §§ 1981, 1981(a) and § 1983.

WHEREFORE, Ms. Donofrio prays that judgment be entered in her favor against Defendant DCPS as follows: that Ms. Donofrio be awarded general and compensatory damages, reinstatement, or front pay, back pay, prejudgment interest; that Ms. Donofrio be awarded reasonable attorneys' fees and costs pursuant to 42 U.S.C. §§ 1981, 1981(a) and § 1983; and, that Ms. Donofrio be awarded such other relief as the Court deems just and proper.

<u>**COUNT II**</u>
<u>**RETALIATION IN VIOLATION OF THE FLORIDA CIVIL RIGHTS ACT, § 760**</u>
<u>**(AGAINST DCPS)**</u>

Ms. Donofrio incorporates by reference all allegations of this Complaint in paragraphs 1 to 166 as if set forth fully herein.

182. Defendant DCPS is an employer within the meaning of the Florida Civil Rights Act ("FCRA"), Florida Statutes, § 760, *et seq.*

183. Ms. Donofrio is a white woman, subject to the protections of the FCRA.

184. Ms. Donofrio engaged in protected activity as set forth in Paragraph 154.

185. Ms. Donofrio was subject to adverse employment action as set forth in Paragraph 155.

186. Ms. Donofrio's protected conduct and the adverse actions she suffered are causally related.

187. As a result of Defendant DCPS' conduct, Ms. Donofrio has suffered general and compensatory damages.

188. As a further result of Defendant DCPS' conduct, Ms. Donofrio has retained the undersigned law firm as her counsel.

189. Ms. Donofrio requests that she be awarded reasonable attorneys' fees and costs of suit pursuant to the FCRA.

190. Ms. Donofrio has exhausted all administrative remedies prior to bringing the claims in this lawsuit. *See* **Exhibit "1."**

191. By and through the conduct described above, Defendant DCPS permitted a pattern and practice of unlawful retaliation in violation of the Civil Rights Act of 1964 and the FRCA.

192. Ms. Donofrio is informed and believes, and based thereon alleges, that in addition to the practices enumerated above, Defendant DCPS may have engaged in other retaliatory practices against her which are not yet fully known. At such time as such retaliatory

practices become known, Ms. Donofrio will seek leave of Court to amend this Complaint in that regard once applicable administrative remedies have been exhausted.

193.    Ms. Donofrio suffered damages as a result of Defendant DCPS' conduct, by and through its agents, employees, and/or representatives.

194.    Ms. Donofrio has suffered damages including compensatory damages for wage loss, front pay, back pay, pain and suffering, humiliation, loss of opportunities and the like, as a result of the Defendant DCPS' conduct, by and through its agents, employees and/or representatives.

WHEREFORE, Ms. Donofrio prays that judgment be entered in her favor and against Defendant DCPS as follows: hat Ms. Donofrio be awarded general damages, compensatory damages, and prejudgment interest; that Ms. Donofrio be awarded reasonable attorneys' fees and costs of suit pursuant to the FCRA; and, that Ms. Donofrio be awarded such other and further relief as the Court deems just and proper.

## COUNT III
## RETALIATION IN VIOLATION OF TITLE VII
## (AGAINST DCPS)

Ms. Donofrio incorporates by reference all allegations of this Complaint in paragraphs 1 to 166 as if set forth fully herein.

195.    Defendant DCPS is an employer within the meaning of the Title VII.

196.    Ms. Donofrio is a white woman, subject to the protections of the Title VII.

197.    Ms. Donofrio engaged in protected activity as set forth in Paragraph 154.

198.    Ms. Donofrio was subject to adverse employment action as set forth in Paragraph 155.

199.    Ms. Donofrio's protected conduct and adverse actions are causally related.

200.    As a result of Defendant DCPS' conduct, Ms. Donofrio has suffered general and compensatory damages.

201.    As a further result of Defendant DCPS' conduct, Ms. Donofrio has retained the undersigned law firm as her counsel.

202.    Ms. Donofrio requests that she be awarded reasonable attorney's fees and costs of suit pursuant to the Title VII.

203.    Ms. Donofrio has exhausted all administrative remedies prior to bringing this lawsuit. ***See Exhibit "1."***

204.    By and through the conduct described above, Defendant DCPS permitted a pattern and practice of unlawful retaliation in violation of the Civil Rights Act of 1964.

205.    Ms. Donofrio is informed and believes, and based thereon alleges, that in addition to the practices enumerated above, Defendant DCPS may have engaged in other retaliatory practices against her which are not yet fully known. At such time as such retaliatory practices become known, Ms. Donofrio will seek leave of Court to amend this Complaint in that regard once applicable administrative remedies have been exhausted.

206.    Ms. Donofrio suffered damages as a result of Defendant DCPS' conduct, by and through its agents, employees, and/or representatives.

207.    Ms. Donofrio has suffered damages including compensatory damages for wage loss, front pay, back pay, pain and suffering, humiliation, loss of opportunities and the like, as a result of the Defendant DCPS' conduct, by and through its agents, employees and/or representatives.

WHEREFORE, Ms. Donofrio prays that judgment be entered in her favor and against Defendant DCPS as follows:  that Ms. Donofrio be awarded general damages, compensatory

damages, and prejudgment interest; that Ms. Donofrio be awarded reasonable attorneys' fees and costs of suit pursuant to Title VII; and, that Ms. Donofrio be awarded such other and further relief as the Court deems just and proper.

**COUNT IV**
**FIRST AMENDMENT VIOLATION**
**(AGAINST ALL DEFENDANTS)**

Ms. Donofrio incorporates by reference all allegations of this Complaint in paragraphs 1 to 166 as if set forth fully herein.

208. Ms. Donofrio, by this civil rights action, brings a claim under 42 U.S.C. § 1983 to vindicate her First Amendment rights and hold Defendant Schneider and Defendant DCPS and its officers and administrators, accountable for depriving her of the same.

209. At all times pertinent hereto, Defendant Schneider, has been employed by Defendant DCPS as its current High School Regional Superintendent and the former principal supervising Ms. Donofrio at the High School.

210. Defendant Schneider now supervises Ms. Donofrio's current principal, Mr. Feagins.

211. Defendants are persons under the laws applicable to this action. Defendants are liable, jointly and severally, for their actions, individually and in concert, which violated the civil rights of Ms. Donofrio under the First Amendment. The law was clearly established at the time that the actions against Ms. Donofrio were taken here.

212. Defendants have deprived Ms. Donofrio of her rights to freedom of speech and expression, protected by the First Amendment.

213. In an apparent attempt to distance itself from the Black Lives Matter movement, Defendants targeted and penalized Ms. Donofrio subsequent to her exercising her legally protected speech.

214.   Defendants allowed a white protestor, and school alumnus, at its public school meeting regarding a name change for Robert E. Lee High School to spew hate speech. That same individual contacted Defendant DCPS about Ms. Donofrio.[20] Defendants failed to soothe any racial tensions; instead, the High School required the Black custodial staff to remain in the cafeteria and to watch the public meeting on television.

215.   As a result of Defendants' conduct, Ms. Donofrio has suffered substantial damages.

216.   The First Amendment to the United States Constitution plainly articulates: Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances. U.S. Const. Amend. I.

217.   By posting on social media, including but not limited to her Facebook page as a private citizen, Ms. Donofrio was engaged in Constitutionally protected speech.

218.   By posting on social media as an employee and co-founder of the EVAC Movement about matters of great public significance, including racial injustice, Ms. Donofrio was engaged in Constitutionally protected speech.

219.   By hanging a Black Lives Matter flag above her classroom door to create a safe space with and for her Black students, not to make any political statement, Ms. Donofrio and her students were engaged in Constitutionally protected speech.

220.   Only narrowly defined categories of speech, like true threats or fighting words, are unprotected by the First Amendment, and neither false, confusing, misleading, critical, juvenile, insulting, nor offensive speech are among them.

---

[20] https://www.news4jax.com/news/local/2021/03/23/duval-county-teacher-says-she-was-told-to-remove-blm-flag-from-classroom/

221. All other speech, whether profound or profane, false or fictional, is fully protected.

222. Here, Ms. Donofrio's speech on her Facebook page was protected activity.

223. Here, Ms. Donofrio's act of hanging a Black Lives Matter flag with her students was protected activity.

224. Here, Ms. Donofrio's act of participating and co-founding the EVAC Movement is protected activity.

225. Here, Ms. Donofrio's act of speaking out against racist hate speech at the public meetings discussing the School's name change is protected activity.

226. For this count, the social media posts subject to protection include but are not limited to the following:

    A.      March 30, 2021:



    B.      March 26, 2021:



C.      Repost of this the news article from March 26, 2021, reporting the cancelation of the class and student protest.[21] The story used Ms. Donofrio's footage of students protesting with her flag. Students noticed the removal of the Black Lives Matter flag and were interviewed by the media. Students were denied the opportunity to protest both the removal of the flag and Ms. Donofrio.

D.      March 24, 2021, referencing the High School administration removing her flag the night before:



E.      March 15, 2021, post and repost of the public meeting on changing the name Robert E. Lee High School:



F.      February 12, 2021, yearbook photo post:

---

[21] https://www.news4jax.com/news/local/2021/03/24/removal-of-lee-high-teachers-blm-flag-sparks-student-response/?fbclid=IwAR3FZXBC5hgRm-IdEuyJp1ALRrwO4GuMCMRDTtcSA_xdhB8GzN8wSdPYHRI).



G.    Ms. Donofrio's January 18, 2021, post about slain Black youth, Reginal Boston:



H.    December 29, 2020, post:



I.    December 18, 2020, post:



J.      November 7, 2020, post:



K.      September 3, 2020, post:



L.      May 13, 2020, post:



M.     March 26, 2020, post:



227.   The topic of Ms. Donofrio's speech includes matters of public concern.

228.   Ms. Donofrio's constitutionally protected speech did not itself disrupt the workplace and

Defendants have no legitimate competing interest in prohibiting it for the Court to balance

under *Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205*, *Will Cty., Illinois*, 391 U.S. 563,

568 (1968).

229.   Ms. Donofrio meets the elements of the *Pickering* test in that her speech involved a matter

of public concern; her interest in her speech outweighs the government's legitimate interest

in efficient public service; and, the speech played a substantial part in the government's challenged employment decisions.

230.   Defendants are unable to establish that they would have made the same employment decision even in the absence of the protected speech.

231.   Ms. Donofrio's speech was made to the general public and goes beyond employee's professional responsibilities. In fact, the speech was of a topic at the forefront of the national dialogue and at the center of the health and well-being of Black and Brown youth in America.

232.   Ms. Donofrio's speech and conduct did not cause disruption in the actual workplace.

233.   Ms. Donofrio's speech was a positive outlet for students processing tumultuous racial times.

234.   To the extent any balancing is required, Ms. Donofrio's interest as a citizen in commenting on the matter outweighed the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.

235.   Defendants selectively enforce the messages they seek to prohibit. Defendant DCPS permits hate speech at its meetings and openly endorses the LGBTQ+ community; but, refuses to allow speech or expression related to Black Lives Matter.

236.   The State is not permitted to chill or censor speech in order to avoid public outcry.

237.   The fear of offending one member of the community who is neither a parent nor alumni is not a reasonable justification for a restriction on an employee's speech.

238.   Ms. Donofrio suffered adverse employment actions, including but not limited to:

A.      Transfer;

B.      Loss of opportunity;

     C.      Removal from her classroom;

     D.      Falsified charges;

     E.      Referral to professional standards; and,

     F.      Otherwise made to endure a hostile work environment.

239.    These adverse actions would chill an ordinary person in exercising her constitutional rights.

240.    Ms. Donofrio's speech was a substantial or motivating factor in the adverse employment actions that she suffered.

241.    Defendants subjected Ms. Donofrio to adverse employment actions and a hostile work environment in violation of the First Amendment to the United States Constitution and 42 U.S.C. §1983.

242.    The unlawful conduct of Defendants was undertaken with malice or reckless indifference to Ms. Donofrio's federally protected rights.

243.    The actions of the Defendant DCPS (and the Defendant Schneider in his official capacity) amounts to a custom, policy, or practice that was the moving force behind the violation of Ms. Donofrio's rights. It either voted on, approved, or ratified the actions that occurred in this case.

244.    Defendant Schneider, the individual named herein, acted in both his personal and official capacities.

245.    Ms. Donofrio's speech was chilled, and Defendants also punished her for her speech due to her speech's conduct and due to Ms. Donofrio's viewpoint.

246.    Ms. Donofrio's freedom of speech and thought flows not from the beneficence of the state but from inalienable rights of the person.

247.   Society has the right and civic duty to engage in open, dynamic, rational discourse. These ends are not well served when the government seeks to orchestrated public discussion through content-based mandates. *United States v. Alvarez*, 567 U.S. 709, 727 (2012).

248.   "If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Snyder v. Phelps*, 562 U.S. 443, 458, 131 S.Ct. 1207, 179 L.Ed.2d 172 (2011) (citation and internal quotation marks omitted).

249.   It is our freedom as Americans, particularly the freedom of speech, which generally allows us to express our views without fear of government sanction. *Bible Believers v. Wayne Cnty.*, 805 F.3d 228, 233 (6th Cir. 2015).

250.   Content-based regulation of private speech by the government is presumptively unlawful and subject to the First Amendment's "most exacting scrutiny." *Tuner v. FCC*, 522 U.S. 622, 641 (1994).

251.   Defendant Schneider, in his official capacity, was the final decision maker in the adverse actions described in part above. He, individually and through the Principals and Assistant Principals ["The Administration"] participated in the actions adverse to Ms. Donofrio and/or in the decisions to engage in such actions, in violation of her rights to free speech and expression under the First Amendment.

252.   Defendant Schneider was the final decision makers in the actions taken against Ms. Donofrio complained of herein.

253.   Defendant Schneider, through other employees or agents, including the Administration, also failed to implement adequate hiring, retaining, staffing, training and/or supervisory

procedures, as a direct result of which Ms. Donofrio's First Amendment rights were violated.

254. Defendant Schneider, through other employees or agents, including the Administration, also failed to implement adequate and nondiscriminatory policies. as a direct result of which MS. Donofrio's First Amendment rights were violated.

255. Defendant Schneider, by himself and/or through delegated authority to the Administration, had final policymaking authority for the Defendant DCPS and were responsible for hiring, retaining, staffing, training, and supervising other employees of the Defendant DCPS and, when necessary, for investigating alleged wrongdoing by its employees.

256. Alternatively, in the event it were determined that Defendant Schneider and the Administration did not have final policymaking authority for Defendant DCPS, one or both nonetheless functioned as the final policymakers for Defendant DCPS in connection with the allegations herein, their decisions and actions having been rubber-stamped at all higher levels of authority.

257. Defendant Schneider, after notice of the constitutional violations alleged herein, officially sanctioned the actions which established a policy, by a final policymaker, that directly or indirectly resulted in violations of Ms. Donofrio's constitutional rights.

258. Further, Defendant Schneider ratified the actions of its employees, including the actions of the administration, who acted adversely to Ms. Donofrio for the exercise of her First Amendment rights.

259. When Defendant Schneider ratified the actions adverse of Ms. Donofrio, such adverse actions became the official policy of Defendant DCPS in retaliation for Ms. Donofrio's exercise of the rights set forth above under the First Amendment.

260.    Applying such scrutiny to the facts alleged herein, Defendants violated Ms. Donofrio's Constitutional Right to Free Speech.

261.    Defendants' adverse actions injured Ms. Donofrio by restraining, preventing, and impairing her lawful speech in a way likely to chill a person of ordinary firmness from propounding further lawful speech.

262.    Ms. Donofrio suffered damages as a direct and proximate result of all the acts alleged herein. Ms. Donofrio has suffered the loss of teaching privileges, advancement, negative personnel history, career opportunities, potential licensing issues, reputational damage, supplemental income, extension pay, and other fringe benefits of employment, as well as emotional grief, stress, and humiliation.

263.    Defendants' acts were willful, egregious, malicious, and/or reckless and, as such, worthy of substantial sanction to punish and deter Defendants and others from engaging in this type of unlawful conduct.

264.    Defendants misused their power, possessed by virtue of state law and made possible only because they were clothed with the authority of state law.

265.    The violations of MS. Donofrio's rights, as described above, occurred under color of state law and are actionable under 42 U.S.C. §1983.

WHEREFORE,  Ms. Donofrio prays that: she be awarded back pay and all lost benefits of employment; damages to compensate Ms. Donofrio for emotional grief, stress, humiliation, career damage, and resultant physical harm caused by Defendants' unlawful actions; the Court issue an injunction requiring Defendants to re-employ Ms. Donofrio at an equivalent job with all employment rights and benefits to which she would have been entitled but for the adverse actions undertaken against her, and without harassment or illegal condition imposed on her job, or, in the

alternative, front pay and benefits in lieu of reinstatement; that Ms. Donofrio be awarded pre and post judgment interest; that Ms. Donofrio be awarded attorneys' fees and costs, litigation expenses, and such other and further relief as the Court deems proper; and, that Ms. Donofrio recover punitive damages from the non-municipal Defendant(s).

## COUNT V
## RETALIATION IN VIOLATION OF TITLE VI
## (AGAINST DCPS)

Ms. Donofrio incorporates by reference all allegations of this Complaint in paragraphs 1 to 166 as if set forth fully herein.

266.   Ms. Donofrio brings this claim against DCPS in violation of Title VI.

267.   Defendant DCPS is an entity within the meaning of Title VI.

268.   Ms. Donofrio is a white woman, subject to the protections of Title VI.

269.   Defendant DCPS is a recipient of monies from the Federal government that are paid for different program and scholarships that, upon information and belief, are provided for the primary purpose of employing faculty and staff at Defendant DCPS to teach courses and implement programs for high school students.

270.   Defendant DCPS, as recipient of said financial aid from the Federal government is precluded from denying the benefits of, or discriminating against, Ms. Donofrio in violation of Title VI of the Civil Rights Act of 1964. 42 U.S.C. § 2000d.

271.   The Spending Clause of the United States Constitution, U.S. Const. art. I, § 8, cl. 1. "When Congress acts pursuant to its spending power, it generates legislation 'much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions."

272.   Ms. Donofrio engaged in protected activity as set forth in Paragraph 154.

273.   Ms. Donofrio was subject to adverse employment action as set forth in Paragraph 155.

274.   Ms. Donofrio's protected conduct and adverse actions are causally related.

275.   As a result of Defendant DCPS' conduct, Ms. Donofrio has suffered general and compensatory damages.

276.   As a further result of Defendant DCPS' conduct, Ms. Donofrio has retained the undersigned law firm as her counsel.

277.   Ms. Donofrio requests that she be awarded reasonable attorneys' fees and costs of suit pursuant to the Title VII.

278.   Ms. Donofrio has exhausted all administrative remedies prior to bringing this lawsuit. ***See Exhibit "1."***

279.   By and through the conduct described above, Defendant DCPS permitted a pattern and practice of unlawful retaliation in violation of Title VI.

280.   MS. Donofrio is informed and believes, and based thereon alleges, that in addition to the practices enumerated above, Defendants may have engaged in other retaliatory practices against her which are not yet fully known. At such time as such retaliatory practices become known, Ms. Donofrio will seek leave of Court to amend this Complaint in that regard.

281.   Ms. Donofrio suffered damages as a result of Defendant DCPS' conduct, by and through its agents, employees, and/or representatives.

282.   Ms. Donofrio has suffered damages including compensatory damages for wage loss, front pay, back pay, pain and suffering, humiliation, loss of opportunities and the like, as a result of the Defendant DCPS' conduct, by and through its agents, employees and/or representatives.

WHEREFORE, Ms. Donofrio prays that: judgment be entered in her favor and against

Defendant DCPS as follows: that Ms. Donofrio be awarded general damages, compensatory damages, and prejudgment interest; that Ms. Donofrio be awarded reasonable attorneys' fees and costs of suit pursuant to Title VI; and, that Ms. Donofrio be awarded such other and further relief as the Court deems just and proper.

## COUNT VII
## FLA. STAT. §1003.4505 – PROTECTION OF SCHOOL SPEECH
## (AGAINST DCPS)

Ms. Donofrio incorporates by reference all allegations of this Complaint in paragraphs 1 to 166 as if set forth fully herein.

283.  Ms. Donofrio brings this calm under Fla. Stat. §1003.4505, Protection of School Speech.

284.  In 2010, the Florida legislature enacted the statute regarding "Protection of School Speech," with states:

> *District school boards, administrative personnel, and instructional personnel are prohibited from taking affirmative action, including, but not limited to, the entry into any agreement, that infringes or waives the rights or freedoms afforded to instructional personnel, school staff, or students by the First Amendment to the United States Constitution, in the absence of the express written consent of any individual whose constitutional rights would be impacted by such infringement or waiver.*

Fla. Stat. § 1003.4505

285.  Ms. Donofrio contends that her freedom of speech was infringed as alleged in paragraph 226. Donofrio further alleges that she was subject to affirmative action in that she was harassed, retaliated against and subjected to adverse action as defined in Paragraph 155. Ms. Donofrio readopts those paragraphs herein.

286.  Ms. Donofrio seeks all remedies available at law and in equity under Fla. Stat. § 1003.4505.

287.  Ms. Donofrio has exhausted all pre-suit requisites.

WHEREFORE,  Ms. Donofrio prays that: she be awarded back pay and all lost benefits of employment; damages to compensate Ms. Donofrio for emotional grief, stress, humiliation, career damage, and resultant physical harm caused by Defendants' unlawful actions;  the Court issue an injunction requiring Defendants to re-employ Plaintiff at an equivalent job with all employment rights and benefits to which she would have been entitled but for the adverse actions undertaken against her, and without harassment or illegal condition imposed on her job, or, in the alternative, front pay and benefits in lieu of reinstatement; that Ms. Donofrio be awarded pre and post judgment interest; that Ms. Donofrio be awarded attorney fees and costs, litigation expenses, and such other and further relief as the Court deems proper.

## COUNT VIII
## INJUNCTION
## (DEFENDANT DCPS)

Ms. Donofrio incorporates by reference all allegations of this Complaint in paragraphs 1 to 166 as if set forth fully herein.

288.    As set forth above, Defendants violated state and federal law.

289.    Ms. Donofrio is a current employee of Defendant DCPS.

290.    As of March 25, 2021, Defendant DCPS assigned Ms. Donofrio to Bulls Bay Consolidated Warehouse, which is not a teaching assignment. It is locally known as "teacher jail."

291.    Defendants have caused the cancelation of the EVAC Movement class offered for course credit, reduced to a club, and then relegated it to a student activity.

292.    Defendants' policies have been selectively enforced, retaliatory, and otherwise have a chilling effect on Ms. Donofrio's right to free speech.

293.    Defendants' policies are retaliatory as they relate to:

A.      Ms. Donofrio's ability to wear clothing to memorialize the loss of a loved one;

B.  Ms. Donofrio's ability to peacefully display messages and images in support of the Black Lives Matter movement;

C.  Ms. Donofrio's ability to peacefully display messages and images in support of the EVAC Movement;

D.  Ms. Donofrio's personal ability to peacefully organize and support the EVAC Movement's activities;

E.  Ms. Donofrio's ability to perform her duties and teach her students in a workplace free from discrimination, harassment, and retaliation;

F.  Ms. Donofrio's ability to perform her duties and teach the curriculum of her speech and leadership class;

G.  MS. Donofrio's ability to post on her individual social media account and speak publicly about matters of public importance;

H.   The discussion of the High School's name change and events that have great importance to the Black student and faculty population at Robert E. Lee High School; and,

I.  Other matters the court determines to be in violation of the law.

294.  Ms. Donofrio seeks an injunction to correct the Defendants' violations including but not limited to:

A.  Ms. Donofrio's return to the classroom;

B.  Dismissal of all past investigations against Ms. Donofrio and removal of said items from her personnel file;

C.  Dismissal of current investigations pending against Ms. Donofrio and removal of said items form her personnel file;

D.      Removal of all past investigations and disciplinary actions against Ms. Donofrio referenced herein, where there was no wrongdoing found or discipline ultimately imposed;

E.      Reinstatement of all paid time used as described in the adverse actions;

F.      Removal of all documents from Ms. Donofrio's personnel file relating to Defendants' retaliatory investigations and false allegations against her;

G.      Reinstatement of the EVAC Movement as a class;

H.      Striking as void Defendants' policies that are retaliatory or discriminatory, including any policies that prevent teachers and faculty from engaging in free speech about non-political social movements;

I.      Redressing any of the adverse actions set forth in paragraph 155.

295.    Failure to redress these matters will result in irreparable harm to Ms. Donofrio.

296.    The granting of injunctive relief will also serve the public interest by protecting others from discriminatory and retaliation in the workplace as well as ensure free speech rights.

WHEREFORE, Ms. Donofrio seeks injunctive relief to remedy the numerous violations as set forth in this Complaint in addition to any relief as this Court deems just and proper.

## **<u>DEMAND FOR JURY TRIAL</u>**

Ms. Donofrio demands a trial by jury for all matters so triable.

Dated: April 16, 2021.

//

//

//

//

Respectfully submitted,

| SCOTT WAGNER & ASSOCIATES, P.A.<br>Jupiter Gardens<br>250 South Central Boulevard, Suite 104-A<br>Jupiter, FL 33458<br>Telephone: (561) 653-0008<br>Facsimile: (561) 653-0020<br><br>s/*Cathleen Scott*<br>Cathleen Scott, Esq.<br>Florida Bar No. 135331<br>Primary e-mail: CScott@scottwagnerlaw.com<br>Secondary e-mail: mail@scottwagnerlaw.com<br>Secondary Address:  101 Northpoint Parkway<br>West Palm Beach, FL 33407<br>www.ScottWagnerLaw.com | SOUTHERN POVERTY LAW CENTER, INC.<br>P.O. Box 12463<br>Miami, FL 33101<br>Facsimile: (786) 237-2949<br>www.splcenter.org<br><br>s/*Bacardi Jackson*<br>Bacardi Jackson, Esq.<br>Florida Bar No. 47728<br>Telephone: (786) 570-8047<br>Primary e-mail:<br>Bacardi.Jackson@splcenter.org<br>Secondary e-mail:<br>Bethell.Forbes@splcenter.org |
|---|---|
|  | s/*Evian White De Leon*<br>Evian White De Leon, Esq.[22]<br>Florida Bar No. 84790<br>Telephone: (786) 447-7755<br>Primary e-mail:<br>Evian.WhiteDeLeon@splcenter.org<br>Secondary e-mail:<br>Yasamin.Sharifi@splcenter.org |

---

[22] Evian White De Leon, Esq.'s application for admission to the U.S. District Court of the Middle District of Florida is forthcoming.